## MASSACHUSETTS *v.* NEW YORK ET AL.

### IN EQUITY.

No. 14, Original. Argued March 4, 1926.—Decided April 12, 1926.

1. Property and dominion over lands in America discovered under royal authority vested in the Crown to be held as part of the public domain for the benefit of the nation. P. 85.
2. As a result of the Revolution, the people of each State became sovereign, and in that capacity acquired the rights of the Crown in the public domain. *Id.*
3. A treaty between two of the States granting land and reserving jurisdictional rights is to be construed with regard not only to technical meanings of words used, but also to public convenience, avoidance of controversy, and the object to be achieved. P. 87.

9542°—26——5

4. In construing such an instrument as the Treaty of Hartford, the applicable principles of English law, well understood at its time, the object of the grants made, contemporaneous construction of it and long usage under it, are all to be given consideration and weight. P. 87.

5. By this treaty, made December 16, 1786, with the avowed purpose of settling all controversies over the territory involved, Massachusetts granted to New York "all the claim, right and title" which Massachusetts had "to government, sovereignty and jurisdiction" over a large area now in Western New York, then claimed by both States under conflicting royal charters, and New York ceded to Massachusetts "the right of preëmption of the soil from the native Indians, and all other right, title and property (the right and title of government, sovereignty and jurisdiction excepted) which the State of New York" had in or to the lands and territories within an area described, extending from Pennsylvania on the south to the international boundary on the north, thus embracing not only the southern shores of Lake Ontario but also in part its navigable waters, which were the principal means of access to the region covered by the grant. The treaty contained a clause securing the right of Massachusetts and her grantees to use the waters of the lake for navigation and fishery. There were numerous islands within the part of the lake embraced by the description. *Held* that the treaty conveyed to Massachusetts no title to the bed of the lake, but vested this in New York as incident to the sovereignty both granted and reserved to that State over the area described. Pp. 85–90.

6. Wherever there is a grant by a State having power to make it of the rights and title of government and sovereignty over a specified territory, or where, in a grant of land to be held in private ownership by one State within the limits of another, there is a reservation to the grantor State of these sovereign rights, the grant or reservation carries with it, as an incident, title to any lands under navigable waters. P. 89.

7. The rule that a grant whose boundaries extend to the "shore," or "along the shore," of the sea carries only to high water, is inapplicable to conveyances of land on non-tidal waters. P. 92.

8. A conveyance by Massachusetts of land, (part of that ceded to her by the Treaty of Hartford,) bounded by a line extending "to the shore" and thence "along the shores" of Lake Ontario, carried to the water; therefore she was not entitled to subsequent additions to the strip of shore, made by accretions or filling. P. 91.

9. Practical construction by the two States of the Treaty of Hartford and of the grants made by Massachusetts immediately following it, and long continued acquiescence by Massachusetts in that construction, support the conclusion that Massachusetts neither acquired, under the treaty, proprietary title to land in the bed of Lake Ontario next the shore, nor reserved the shore when alienating the upland. P. 94.

10. In a suit between States not involving any public boundary or public ownership, costs are awarded against the defeated plaintiff. P. 96.

Bill dismissed.

Suit brought in this Court by the Commonwealth of Massachusetts against the State of New York, the City of Rochester, private corporations and individuals,* wherein the plaintiff asserted title to a narrow strip of land on the water front in the City, and sought to enjoin the City from taking it by eminent domain, or, in the alternative, to obtain money compensation for such taking.   See *post,* p. 636.

*Mr. Edwin H. Abbott, Jr.,* with whom *Mr. Jay R. Benton,* Attorney General of Massachusetts, was on the brief, for complainant.

The Hartford Treaty released and ceded to Massachusetts title to that part of the bed of Lake Ontario described in Article II. As the consideration for the grant and release of sovereignty made to New York by

---

* The docket title of the case, with the names of parties, is as follows: Commonwealth of Massachusetts, Plaintiff, v. State of New York; City of Rochester; James L. Hotchkiss, Clerk of the County of Monroe, State of New York; Eugene Van Voorhis, John A. Vanderwerf and Charles C. Beahan, Commissioners of Appraisal; New York Central Railroad Company; Ontario Beach Hotel & Amusement Company; Central Union Trust Company of New York; Upton Company; Anna T. Granger; Emil Boshart; Rebecca Boshart; Bartholomay Brewing Company; Milton J. McIntyre; Belle McIntyre; Twentieth Ward Co-operative Savings and Loan Association; and The Farmers Loan & Trust Company, Defendants.

Article I was the lands and territories released to Massachusetts by Article II, together with the further privileges and safeguards accorded by subsequent articles of the treaty to protect the territory so released, it is inadmissible to construe this portion of Article II as if the lands thereby conveyed had been bounded upon the edge of Lake Ontario, and not upon the international line which ran through the centre of the lake. The express words of the treaty must receive due effect. *Asakura* v. *Seattle,* 265 U. S. 332; *Green* v. *Biddle,* 8 Wheat. 1.

Neither Massachusetts nor New York had made good its asserted title either to the sovereignty or to the soil of the tract in dispute. The conflicting claims stood squarely opposed. Each State stood equal in this respect, unless the fact that Massachusetts claimed under the earlier royal grant in 1620, while New York claimed under a grant made in 1666, gave Massachusetts an advantage. Unlimited as yet by Art. I, sec. 10, of the Constitution, they could make such compact as they chose in order to settle their difference. *Wharton* v. *Wise,* 153 U. S. 155; *Rhode Island* v. *Massachusetts,* 12 Pet. 657. Both before and since the Constitution conflicting rights as to sovereignty, boundary and navigable waters have been settled by compacts between States. *Howard* v. *Ingersoll,* 13 How. 381; *Alabama* v. *Georgia,* 23 How. 505; *Devoe Mfg. Co., Petr.,* 108 U. S. 401; *Central R. R. of N. J.* v. *Jersey City,* 209 U. S. 473; *Georgia* v. *South Carolina,* 257 U. S. 516. Such compacts (especially those made prior to the adoption of the Constitution) stand upon a broader foundation than grants to individuals or corporations by statute or otherwise. The exception of sovereignty from " the right of preëmption from the native Indians and all other the estate, right, title and property " granted and released to Massachusetts by Article II, merely preserved intact the grant and release of sovereignty already made by Massachusetts in Article I. It

did not enlarge that release. It simply made clear that Massachusetts was to take title and every property interest in the whole tract described, while New York was to have sovereignty over it.

The property rights which New York was to receive under the Treaty are defined by Article III which grants and releases to her, in language similar to that used in Article II, " the right of preëmption of the soil from the native Indians, and all other the estate, right, title and property which the Commonwealth of Massachusetts hath of, in or to the residue of the lands and territories so claimed by the State of New York as hereinbefore stated and particularly specified " (in the preamble of the treaty).

In seeking so to extend the word " sovereignty " by implication, the defendants overlook the fact that that very sovereignty is qualified by other articles of the Treaty in order to protect the tract released to Massachusetts by Article II. Neither Article I nor Article II purport to cede or release any lands to New York. The lands ceded and released to New York, which include not only the upland but also a part of the bed of the lake, are defined by Article III, which includes only the " residue of the lands and territories " which remains after the description in Article II is fully satisfied. The express grant to New York in Article III excludes any implied grant to New York of any part of the lands described and released to Massachusetts by Article II. *Green* v. *Biddle,* 8 Wheat. 1.

Within five years of the Treaty, Massachusetts, to the knowledge of New York but without any protest from that State, unequivocally asserted her title to the bed of the lake within the boundaries defined by Article II of the Treaty.

The defendants have not established any title to the *locus* by accretion. The burden is on the defendants to prove title by accretion. Accretions belong only to that land which bounds upon and is in contact with the water.

The physical nature of the boundary called for by
Mass. St. 1788, c. 23, (the effective conveyance to Phelps
and Gorham,) is to be determined by construing that act
in the light of the Massachusetts decisions, while the legal
incidents flowing from the nature of the physical bound-
ary so ascertained depend upon and are determined by
the law of New York, in which the land lies.

In New York the question whether a given boundary
is in law in contact with the water depends upon the
given boundary and the nature of the water. A deed
calling for the sea as a boundary conveys to the ordinary
high water mark. *Shively* v. *Bowlby,* 152 U. S. 1; *Sage*
v. *Mayor of New York,* 154 N. Y. 61; *Matter of Mayor
of New York,* 182 N. Y. 361; *Nevins* v. *Friedauer,* 198
App. Div. 250. On the other hand, a boundary upon the
cliff or beach is not a call for the sea and does not define
a line in contact with the water. *Trustees of East-
hampton* v. *Kirk,* 84 N. Y. 215. A grant which bounds
the premises conveyed upon a navigable lake conveys
to low water mark. *Stewart* v. *Turney,* 237 N. Y. 117;
*Champlain & St. L. R. R.* v. *Valentine,* 19 Barb. 484;
*People* v. *Canal Commrs.,* 5 Wend. 423; *Wheeler* v.
*Spinola,* 54 N. Y. 377. A boundary upon the beach, upon
the shore or upon high water mark of a navigable lake
does not convey to the edge of the water or confer riparian
rights. *People ex rel. Burnham* v. *Jones,* 112 N. Y. 597;
*Geneva* v. *Henson,* 195 N. Y. 447; *New York Central &
H. R. R. R. Co.* v. *Moore,* 137 App. Div. 461, aff'd. 203
N. Y. 615; *Cook* v. *McClure,* 58 N. Y. 437; *Sloan* v. *Bie-
miller,* 34 Oh. St. 492; *Axline* v. *Shaw,* 35 Fla. 305. Inti-
mations in *People ex rel. Burnham* v. *Jones, supra,* and
*Matter of the City of Buffalo,* 206 N. Y. 319, that the
line of contact with the waters of a navigable lake is high
water mark, were overruled in *Stewart* v. *Turney,* 237
N. Y. 117.

A boundary upon a navigable river, above the point
where the tide ebbs and flows, conveys only to the water's

edge and includes no part of the bed. *Danes* v. *New York,* 219 N. Y. 67; *Fulton L. H. & P. Co.* v. *New York,* 200 N. Y. 400; *People* v *Canal Appraisers,* 33 N Y. 461; *Tibbetts Case,* 5 Wend. 423, 13 Wend. 355, 17 Wend. 571, 19 N. Y. 523. A grant bounded upon a non-navigable stream, or upon a small lake or pond which is susceptible of private ownership, passes title to the thread of the stream, or to the center of the pond or little lake as the case may be. *Fulton L. H. & P. Co.* v. *New York,* 200 N. Y. 400; *Calkins* v. *Hart,* 219 N. Y. 145; *Gouverneur* v. *Natl. Ice Co.,* 134 N. Y. 355; *Smith* v. *Rochester,* 92 N. Y. 463. On the other hand, a boundary upon the bank or margin of a non-navigable stream restricts the conveyance to low water mark even though the grantor might have conveyed to the thread of the stream. *Child* v. *Starr,* 4 Hill 369, 5 Denio 599; *Babcock* v. *Utter,* 1 Abb. Ct. of App. 27; *Halsey* v. *McCormick,* 13 N. Y. 296; *Matter of the City of New York,* 212 N. Y. 328.

The statute is a grant by Massachusetts to two of its citizens. Such grants are always construed in favor of the State and againt the grantees; nothing can be inferred against the State. *Charles River Bridge* v. *Warren Bridge,* 11 Pet. 420.

While the legislature accepted and adopted the description of the metes and bounds furnished and requested by Gorham and Phelps, the changes in the instrument show that that description was carefully considered and clearly understood by the legislature according to its tenor.

Where a tract bounds upon, and so excludes, the shore, the word "appurtenances" passes no part of the shore nor any land beneath the water. *Geneva* v. *Henson,* 195 N. Y. 447; *Commonwealth* v. *Alger,* 7 Cush. 53; *Whitmore* v. *Brown,* 110 Me. 410; *Dunlap* v. *Stetson,* 4 Mason 349.

Thus, by striking out the enumeration employed in the Indian deed and substituting therefor the word "appur-

tenances," the legislature eliminated from the description the only language which by any stretch of construction could have included anything outside the boundaries described. This is a clear indication of the intention that the description furnished by the grantees is not to include anything not expressly within the terms thereof when strictly construed according to the rules of law. The precise question, therefore, is whether a statutory grant by the Commonwealth to two of its citizens, which, at the request of the grantees, runs the western line along or in reference to the Genesee River " to the shore of the Ontario Lake " and runs the north line " thence eastwardly along the shores of said Lake " conveys to the low water mark or only to the line where shore and upland meet. See *Storer* v. *Freeman,* 6 Mass. 435; *Saltonstall* v. *Proprietors of Long Wharf,* 7 Cush. 195; note to *Commonwealth* v. *Roxbury,* 9 Gray 451; *Niles* v. *Patch,* 13 Gray 254; *Chapman* v. *Edmands,* 3 Allen 512; *Boston* v. *Richardson,* 13 Allen 146; *Tappan* v. *Burnham,* 8 Allen 65; *Litchfield* v. *Scituate,* 136 Mass. 39; *Litchfield* v. *Ferguson,* 141 Mass. 97; *Castor* v. *Smith,* 211 Mass. 473. The cases show that at the time when St. 1788, c. 23, was enacted the words " to the shore and along the shore " had already acquired a settled meaning which excluded the shore or beach. The rule is not peculiar to Massachusetts. It is generally in force in other States, including New York. Gould on Waters, § 199.

It may be that the defendants will contend that fresh non-tidal waters possess no high water mark and therefore have no shore. Such is not the law. In Iowa and Arkansas a call for a navigable river fixes the boundary at high water mark. *Barney* v. *Keokuk,* 94 U. S. 324; *Park Commissioners* v. *Taylor,* 133 Ia. 453; *Bennett* v. *Natl. Starch Co.,* 103 Ia. 207; *Wallace* v. *Driver,* 61 Ark. 429; *St. Louis, etc., Ry. Co.* v. *Ramsey,* 53 Ark. 314; *Winford* v. *Griffin,* 1 Fed. (2d) 224. Cf. *Howard* v.

*Ingersoll,* 13 How. 381; *Alabama* v. *Georgia,* 23 How. 505; *Oklahoma* v. *Texas,* 260 U. S. 606.   In New York and Illinois it was intimated that a call for one of the Great Lakes as a boundary conveyed to high water mark.   *People ex rel. Burnham* v. *Jones,* 112 N. Y. 597; *Matter of the City of Buffalo,* 206 N. Y. 319; *People* v. *Kirk,* 162 Ill. 138; *Cobb* v. *Commissioners,* 202 Ill. 427; *Illinois Central R. R.* v. *Chicago,* 176 U. S. 648.   These intimations did not finally crystallize into law; in both States a call for a navigable lake bounds the tract conveyed upon low water mark.   *Stewart* v. *Turney,* 237 N. Y. 117; *Brundage* v. *Knox,* 277 Ill. 470.   But the final selection of the low water mark as the line of contact with the water necessarily recognizes that a high water mark exists in fact.   Thus, a grant bounded upon the high water mark of a pond conveys to a fixed and unchanging line which is not in contact with the water.   *Cook* v. *McClure,* 58 N. Y. 437; *Nixon* v. *Walter,* 41 N. J. Eq. 103.

The boundary running " to the shore of the Ontario Lake, thence eastwardly along the shores of said Lake " when read in the light of attendant conditions and the state of the law existent at the time of its enactment, restricts the grant to the upland, and includes no part of the shore or beach.   It does not convey to low water mark or define a line in contact with the water.   *Axline* v. *Shaw,* 35 Fla. 305; *People ex rel. Burnham* v. *Jones,* 112 N. Y. 597; *Geneva* v. *Henson,* 195 N. Y. 447; *New York Central, etc., R. R.* v. *Moore,* 137 App. Div. 461, 203 N. Y. 615; *Cook* v. *McClure,* 58 N. Y. 437; *Sloan* v. *Biemiller,* 34 Oh. St. 492; See also *Sweringen* v. *St. Louis,* 151 Mo. 348; *Nixon* v. *Walker,* 41 N. J. Eq. 103.   Cf. *Castle* v. *Elder,* 57 Minn. 289.   Distg. *Stewart* v. *Turney,* 237 N. Y. 117; *Burke* v. *Niles,* 13 N. Bruns. 166; *Haskell* v. *Friend,* 196 Mass. 198; *Doane* v. *Willcutt* 5 Gray 328.

The Shepard survey marks the actual boundary upon the soil at the line where upland and beach meet; pre-

cisely in accordance with the natural meaning of the statute when construed in the light of the Massachusetts cases and applied according to the New York authorities. That survey was made in 1803 and became the basis of the partition deed of October 16, 1804, through which all the individual defendants claim under Sir William Pulteney.

A practical construction of an instrument, concurred in by both parties, is of weight in determining its meaning because they act out the intent which they intended to express. In the absence of such concurrence by both States, there is no practical construction of the instrument, and the court will determine its meaning by construing the language of it. *Handley's Lessee* v. *Anthony;* 5 Wheat. 374; *Alabama* v. *Georgia,* 23 How. 505.

The conveyance to Morris was not a practical construction of the Treaty by Massachusetts which in any way limited her rights thereunder; it was an assertion by Massachusetts of her title to that part of the bed of the lake ceded and released to her by the second article of the Treaty, brought to the knowledge of New York and acquiesced in by that State for nearly a century at least.

The Bartholomay Company and the New York Central Railroad seized and filled the *locus* without right and with notice of the title of the Commonwealth.

The defendants have not established their claim of estoppel.

The Massachusetts statute of limitations is inapplicable, and the defendants do not bring themselves within its terms.

*Messrs. Anson Getman* and *Arthur E. Sutherland,* with whom *Messrs. Albert Ottinger,* Attorney General of New York, *Daniel M. Beach, Clarence P. Moser, Harry Otis Poole,* and *Harry C. Miller* were on the briefs, for defendants.

There have been, and still are, those who assert that the law of England regarded the water-covered lands below high water mark as being alienable by the King for private purposes, without regard to the rights of the upland owner or of the general public; and that such English law became the law of the Colony and State of New York. This doctrine seems to have yielded to a new and more logical view in which the English law is seen as entirely consonant with the civil law doctrine that such lands are held in an entirely different manner from the uplands. A study of the history of the English law bearing on these questions will establish that, even in England, the royal power could not grant lands under navigable waters into unrestricted private ownership and that no such right came down into Colonial and State law.

Careful examination of the proceedings of the Colonial Assemblies fails to reveal any statute or resolution of any kind in any way adopting or even referring to the alleged British " *prima facie* rule " of royal alienability of lands under navigable waters. Colonial Laws, vols. I and II. Those who declare that the common law of England with respect to these subjects became automatically the law of this country will have to find recourse to some other authority than the acts of the People's Assembly itself. As bearing upon the attitude of the Colonists toward underwater lands, attention is directed to a statute passed by the Assembly in 1699 entitled "An Act for Ye Vacateing, Breaking and Annulling of Several Extravagant Grants." Among other grants so characterized as " extravagant " and vacated was one made to John Evans in 1694 purporting to grant land under water and swamp land adjoining the Duke's Farm on Manhattan Island. Col. Laws, vol. I, p. 412.

There seems to have been no judicial affirmation of the *jus privatum* and *jus publicum* rule even in the English courts since *Attorney General* v. *Philpot*, 1633, until after

the American Revolution. As an illustration of the feeling which the English judiciary themselves held. toward the law of the *Philpot Case,* see remarks made by Baron Wood in *Attorney General* v. *St. Aubyn,* Wightwick, 167.

In `1777, the first Constitution was adopted by the Colony of New York. This Constitution contained the following language, " Such parts of the common law of England . . . as . . . did form the law of the said Colony on the 19th day of April, 1775 . . . . shall be and continue the law of this State." This language has been used as authority for the proposition that the 1777 Constitution adopted all of the English law. It seems absurd to suppose that a people who after years of bloody revolution had overthrown the yoke of English rule and had made a treaty whereby they became a free government, actually inherited all the laws of their conquered enemy. In *People* v. *Canal Appraisers,* 33 N. Y. 468, it is clearly pointed out how utterly inapplicable certain portions of the law of England were to the physical conditions which obtained in the new country.

Outside of a few fishing cases there are practically no English cases, decided prior to the American Revolution, relating to foreshore rights, with the possible exception of such decisions as contained in the celebrated *Philpot Case.*

The people in their constitution and statutes since the formation of the State of New York, have always provided that they "Are deemed to possess in their right of sovereignty the original and ultimate title to all land within the jurisdiction of the State." Vol. I, Revised Laws, p. 380; § 2; 1829 Revised Statutes, Title I, Art. I, § 1; Const. 1845, Art. I, § 11, and subsequent State Constitutions.

The colony and State of New York asserted original title to all lands held by reason of sovereignty. *People* v. *Trinity Church,* 22 N. Y. 44. The people's right has

often been regarded as a trust title. *Coxe Case,* 144 N. Y. 396; *People* v. *Baldwin,* 197 App. Div. 285; *Hinkley* v. *State,* 202 App. Div. 570; *Re Long Sault Development Co.,* 212 N. Y. 1; *Speedway Case,* 168 N. Y. 134; *Appleby* v. *City of New York,* 235 N. Y. 351.

It is to be noted that the grant to Massachusetts was for a private—not a sovereign purpose. *Speedway Case,* 168 N. Y. 134, " If the State may use the water ways for any purpose whatsoever, then it is no longer a trustee but an irresponsible autocrat. If it may erect upon our tideways or tide waters any kind of structure that may be suggested by the whim or caprice of those who happen to be in power, it will be possible to destroy navigation and commerce by the very means designed for their preservation and improvement." Probably the clearest statement of the underlying rule governing transfers of sovereign-owned lands is that in the *Coxe Case,* 144 N. Y. 396, where it is said: " The title which the State holds and the power of disposition is an incident and part of its sovereignty that cannot be surrendered, alienated or delegated, except for some public purpose, or some reasonable use which can fairly be said to be for the public benefit." See also the *Long Sault Case,* 212 N. Y. 1; *People* v. *Steeplechase Park Co.,* 218 N. Y. 459; *Appleby* v. *City of New York,* 235 N. Y. 351. Such a grant must be: (a) Limited in extent so as not to amount to a surrender of control over an entire water front, unless to a municipality by delegation. (b) To promote commerce or manufacture. (c) For " beneficial enjoyment."

It has quite frequently been asserted heretofore that the soil under navigable waters including the larger lakes and bodies of tide water, was the subject of private ownership, even in its natural state, save only in those cases where the area involved was large and such area was under a large lake or tide water, *People* v. *Steeplechase*

*Park Co.,* 218 N. Y. 459, and save also lands under the St. Lawrence River, *Matter of Long Sault Development Co.,* 212 N. Y. 1. There are numerous decisions to the effect that the soil under upstate rivers, including the Mohawk, *Williams* v. *Utica,* 217 N. Y. 162, and lakes, excepting possibly Lake Champlain, *Champlain & St. L. R. R. Co.* v. *Valentine,* 19 Barb. 484, and a few other large lakes, *Stewart* v. *Turney,* 237 N. Y. 117, might be privately owned even while covered with water and in a natural state.

The mere grant of a stated area of land under water without conditions is not a withdrawal of that area from navigation and may give no right of withdrawal or right to improve any part thereof. In any event it would give no right to exclude the public immediately. Under such circumstances one may fill at his peril, at least in part. In granting lands under large lakes or navigable tide waters, without any specification as to filling, there is no presumption that all of the area may be filled and the contractual right to do so may not be implied. This very point was involved in *Illinois Central R. R. Co.* v. *Illinois,* 146 U. S. 387, and *People* v. *Steeplechase Park Co.,* 218 N. Y. 459, both decided, however, by a divided court. It was also involved in *Coxe* v. *State,* 144 N. Y. 396.

So long as the land is left in a state of nature the grantee should be held to have only a right to a title which right would be appurtenant to the upland. This is in accordance with the doctrine laid down in *Archibald* v. *Railroad Co.,* 157 N. Y. 574, cited in *Smith* v. *Bartlett,* 180 N. Y. 360, and follows *Peoples Trust Co.* v. *Schenck,* 195 N. Y. 398. If the grantee owned the soil under water, subject, of course, to certain public rights, as he owned the soil to upland, he might convey the upland or the land under water separately. If this is so, the Court of Appeals was wrong in deciding the *Archibald Case* as it did, especially in view of what was said in the *Peoples*

*Trust Company Case.* No grant of land under large navigable lakes and navigable tide waters immediately transfers title to the soil.

Title results only from improvements in the public interest. There is no distinction between a grant which purports to grant the soil and one which grants only the right to fill and thus acquire a so-called title, as considered in *First Const. Co.* v. *State,* 221 N. Y. 295. The soil under navigable tide waters and large lakes in a natural state is not the subject of private ownership in the sense of " title " or " fee title." The people do not have a proprietary title to this soil, *Re Long Sault Development Co.,* 212 N. Y. 1, so cannot convey such a title. From a close scrutiny of many of the federal decisions it is maintainable that what the States got, and what the adjacent owners got, in respect to the banks and beds of navigable water courses, was a collection of relative rights and not a title. *Water Power Co.* v. *Water Commrs.,* 168 U. S. 349.

There would appear to be two tenable theses: (a) There is a title and it is held by the people of the State in trust; or (b) There can be no title and all that can, and do, exist are correlated rights, powers and privileges.

The original source of all title, under American state government, and to all rights in, or powers with respect to, the public domain, is the people of each sovereign State. Massachusetts did not acquire a title to the lands under the waters of Lake Ontario either as a result of the two grants from the King of England in 1620 and 1691, respectively, or the Hartford Treaty. Whatever rights Massachusetts had were of a sovereign nature and passed to New York when New York was recognized to be sovereign. These rights are trust rights and still vest in the people of the State of New York except as surrendered by them in reference to small granted areas.

Neither State had title as the word " title " is generally understood. Whatever rights existed were the rights of

the State at the time sovereign and in control. The sovereign people in control really controlled these rights so far as they were subject to control. When Massachusetts conceded the sovereignty of New York, Massachusetts conceded all of these sovereign rights as existing in New York. This is the legal effect of the Hartford Treaty.

The sixth article reserved equal rights of navigation and fishing on and in Lake Ontario, to the citizens of Massachusetts. If Massachustts owned the soil under Lake Ontario as it claimed to own the upland, and if it continued to own the soil under Lake Ontario, after the Hartford Treaty, these reservations were unnecessary. They appear to have been unnecessary in any event.

This whole case turns on whether Massachusetts or New York could ever sell the southern part of Lake Ontario as it might the adjacent uplands or some small interior lake or stream, even subject to navigation on the waters comprising Lake Ontario. It is the contention of New York that it could not and that the land under Lake Ontario was not the subject of ownership and conveyance as contended by the plaintiff.

If it should be found that Massachusetts did not in fact part with all of the upland owned by it, and that Massachusetts continues to be an owner of upland, with the incidental riparian rights, then the fill in this case might be regarded as unlawful, both as against Massachusetts and against the defendant. In that event, defendant can still claim sovereign rights, as above, to the lands formerly under water, as against plaintiff.

MR. JUSTICE STONE delivered the opinion of the Court.

This is an original suit in equity brought by the Commonwealth of Massachusetts against the State of New York, the City of Rochester in New York, and certain corporations and individuals, to quiet title to land located

in the City of Rochester, and to enjoin the City from taking it by eminent domain, or in the alternative, to have the amount of compensation for the taking determined by this Court. The case was heard upon bill and answer and the report of a Special Master appointed to take proofs and to make an advisory report upon the questions of fact raised by the pleadings, except as to the amount of damages to be paid for the property if taken by eminent domain.

The land in dispute is a narrow strip of about twenty-five acres fronting upon Lake Ontario within the city limits of Rochester. By the Treaty of Hartford, entered into between New York and Massachusetts, December 16, 1786, land within the territorial limits of New York was granted to Massachusetts in private ownership. The title to the land in controversy depends upon the meaning and effect of this treaty, and upon the construction of a subsequent conveyance by Massachusetts of a part of the land thus acquired, through which conveyance the several defendants other than the State of New York derive their title.

Before 1786, Massachusetts and New York claimed, under conflicting royal grants, both sovereignty and title of a large area of what is now western New York. The controversy was settled by the Treaty of Hartford by which Massachusetts gave up all its claim to sovereignty over the territory, and its claim to private ownership in part of it, and New York ceded to Massachusetts, "the Right of pre-emption of the Soil from the native Indians and all other the Estate, Right, Title and Property (the Right and Title of Government Sovereignty and Jurisdiction excepted) which the State of New York hath . . . in or to all the Lands and Territories within the following Limits and Bounds that is to say, BEGINNING in the north boundary Line of the State

9542°—26——6

of Pennsylvania in the parallel of forty-two degrees of north Latitude at a point distant eighty-two miles west from the northeast Corner of the State of Pennsylvania on Delaware River as the said boundary Line hath been run and marked by the Commissioners appointed by the States of Pennsylvania and New York respectively and from the said Point or Place of beginning running on a due meridian north to the boundary Line between the United States of America and the king of Great Britain thence westerly and southerly along the said boundary Line to a meridian which will pass one mile due East from the northern Termination of the Streight or waters between Lake Ontario and Lake Erie thence South along the said Meridian to the South Shore of Lake Ontario thence on the eastern side of the said Streight by a Line always one mile distant from and parallel to the said Streight to Lake Erie thence due west to the boundary Line between the United States and the king of Great Britain thence along the said boundary Line until it meets with the Line of Cession from the State of New York to the United States thence along the said Line of Cession to the northwest corner of the State of Pennsylvania and thence East along the northern boundary Line of the State of Pennsylvania to the said place of beginning."

Article 10 of the Treaty provided that Massachusetts might grant the right of pre-emption in the lands thus acquired, " to any person or persons who by virtue of such Grant shall have good right to extinguish by purchase the claims of the native Indians," by compliance with certain conditions not now important.

By act of the Massachusetts legislature, approved April 1, 1788 (Laws & Res. 1786–7, c. 135, p. 900), it was provided that " this Commonwealth doth hereby agree, to grant, sell & convey." to Oliver Phelps and Nathaniel Gorham for a purchase price stated in the Act " all the Right, Title & Demand, which the said Commonwealth

has in & to the said Western Territory " ceded to it by
the Treaty of Hartford.  On July 8, 1788, the Five Indian
Nations (Mohawks, Oneidas, Onandagas, Cayugas and
Senecas) executed a deed or treaty extinguishing the
Indian claim to the territory described in it and conveying
that territory to Phelps and Gorham.  The description
embraces approximately the east one-third of the terri-
tory ceded to Massachusetts by the Treaty of Hartford,
and begins at a point " in the north boundary line of the
State of Pennsylvania in the parallel of forty-two degrees
north latitude at a point distant eighty-two miles west
from the northeast corner of Pennsylvania on Delaware
river."  The description proceeds by various metes and
bounds to a point on the Genesee River from which, so
far as now material, it reads as follows:

"   .   .   .   thence running in a direction due west
twelve miles, thence running in a direction northwardly,
so as to be twelve miles distant from the most westward
bends of said Genesee River to the shore of the Ontario
Lake thence eastwardly along the shores of said Lake to
a meridian which will pass through the first point or
place of beginning.   .   .   ."

By legislative act (Laws & Res. 1788-9, c. 23, p. 35),
approved November 21, 1788, the Commonwealth of
Massachusetts granted to Phelps and Gorham the land
which had been conveyed by the deed or treaty with the
Five Tribes, the description of the land conveyed being,
so far as it is now material, identical with that in the con-
veyance from the Five Tribes, which we have quoted.  By
treaty between the Six Nations and the United States,
executed November 11, 1794, known as the Pickering
Treaty, 7 Stat. 44, the Indians formally disclaimed any
rights in the land lying east of the west line of the Phelps
and Gorham tract.

The several corporate and individual defendants who
are in possession of or claim an interest in land now in

controversy, derive their title, through mesne conveyances, from Phelps and Gorham, who took under the grants last described, from the Five Tribes and from the Commonwealth of Massachusetts; and Massachusetts is not entitled to relief in this suit unless title in the *locus quo* was acquired by it by the Treaty of Hartford and remained in it after its grant to Phelps and Gorham.

After the Act approved November 21, 1788, Phelps and Gorham having failed to pay the purchase price stipulated in the Resolve of April 1, 1788, a settlement of the contract or agreement between them and the Commonwealth of Massachusetts was effected. By this they retained the easterly one-third of the lands which had been released and confirmed to them by the Five Tribes and later conveyed to them by the Commonwealth of Massachusetts, and they released and quit-claimed to the Commonwealth all their right and title in the remainder of the land.

It is established that, since the grant to Phelps and Gorham, there has been a shifting of the shore line of Lake Ontario, and that the land now in dispute, which, certainly in 1803 and probably at the time of the Phelps and Gorham grant, was under water north of the shore line of Lake Ontario, is now above water and south of the high water mark of the lake. Whether the change in the shore line and in the physical condition of the land in question was due wholly to accretion or partly to accretion and partly to filling, does not clearly appear, and in the view we take of the case, is not material.

The argument of the Commonwealth of Massachusetts is that the legal effect of the Hartford treaty was to release and convey to Massachusetts, within the limits of the description in the grant, the bed of Lake Ontario as it then existed; and that by the treaty it acquired title to the land now in dispute; that its grant to Phelps and Gorham, bounding the land conveyed by a line running " to the Shore of the Ontario Lake; thence eastwardly

along the Shores of the said Lake," carried only to high water mark, and that title to all the land below high water mark as it then existed remained in Massachusetts. Even though this contention that the bed of the lake vested in Massachusetts be decided against it, Massachusetts nevertheless takes the position that the land in dispute was due to accretion, and that all the benefits of the accretion accrued to Massachusetts, because it did acquire title to the shore of the lake by the Treaty of Hartford, and did not part with the title to the shore by its grant to Phelps and Gorham.

The first question which must receive our consideration is whether Massachusetts acquired any title to the bed of Lake Ontario by the Treaty of Hartford. That treaty contained three principal clauses of cession. One granted to New York " all the claim right and Title which the Commonwealth of Massachusetts hath to the Government Sovereignty and Jurisdiction " in all the lands in controversy between the two States. The second granted to Massachusetts " the Right of pre-emption of the Soil from the native Indians and all other the Estate, Right, Title and Property ('the Right and Title of Government, Sovereignty and Jurisdiction excepted)" of the State of New York in that part of the land, the description of which has already been set forth in detail, and which included that part of the bed of the lake lying within the east and west boundaries of the tract ceded, and south of the international boundary. By the third, with which we are not now concerned, Massachusetts gave up and ceded to New York its claim to private ownership in the remainder of the land in controversy.

The English possessions in America were claimed by right of discovery. The rights of property and dominion in the lands discovered by those acting under royal authority were held to vest in the Crown, which under the principles of the British Constitution was deemed to hold

them as a part of the public domain for the benefit of the
nation.    Upon these principles rest the various English
royal charters and grants of territory on the Continent of
North America.    *Johnson* v. *McIntosh*, 8 Wheat. 543, 577
*et seq.*, 595.    As a result of the Revolution, the people of
each State became sovereign and in that capacity acquired
the rights of the Crown in the public domain (*Martin* v.
*Waddell*, 16 Peters 367, 410), and it was by the exercise
of their sovereign power as States that New York and
Massachusetts undertook to make disposition of a portion
of their public domain by the grants contained in the
Treaty of Hartford.

The effect of the grant made to Massachusetts in the
treaty, so far as concerns the question now presented,
depends upon the interpretation of the restrictive lan-
guage excepting from the operation of the grant the
" Right and Title of Government Sovereignty and Juris-
diction " of New York, and of the co-temporaneous grant
by Massachusetts to New York of " all the claim right
and Title which the Commonwealth of Massachusetts
hath to the Government Sovereignty and Jurisdiction "
over all the lands in controversy.    We have to decide
whether the grant and reservation to New York of sov-
ereign rights vested or reserved in New York the title to
the bed of the navigable waters lying within the exterior
limits of the grant made by it to Massachusetts in the
same instrument.

The question is not the vexed one argued at the bar,
whether there was power in New York to grant the soil
beneath its navigable waters in private ownership.    Com-
pare *Martin* v. *Waddell*, *supra*, p. 410.    We need not
consider here whether, in such circumstances, there is a
limitation on the power of a sovereign state to grant its
public domain, nor the nature and extent of the limita-
tion if it exists, for in our view the meaning of the grant
itself determines the principal question which we have to
decide.

In ascertaining that meaning, not only must regard be had to the technical significance of the words used in the grants, but they must be interpreted " with a view to public convenience, and the avoidance of controversy"; and " the great object, where it can be distinctly perceived, ought not to be defeated by those technical perplexities which may sometimes influence contracts between individuals." Marshall, C. J., in *Handly's Lessee* v. *Anthony,* 5 Wheat. 374, 383–4. The applicable principles of English law then well understood, the object of the grant, contemporaneous construction of it, and usage under it for more than a century, all are to be given consideration and weight. *Martin* v. *Waddell, supra.*

The grant made by New York to Massachusetts embraced a vast domain extending more than one hundred and forty miles from east to west, and from the northern boundary of Pennsylvania to the Canadian line, comprising about six million acres of land, largely an unsettled wilderness inhabited by Indians, to which the navigable waters of Lake Ontario were the principal means of access. The purpose of it was, while reserving and securing to New York its right as a sovereign State in the granted territory, to confer upon Massachusetts the right of preemption of the soil from the Indians, and to enable it to make sale of the lands to settlers by conferring on it the power to grant this right of pre-emption.

It does not appear that the Indians ever had or claimed any rights to the soil under the lake or that any attempt was made by Massachusetts or those claiming under it to exercise the granted right of pre-emption with respect to the bed of the lake. Nor is there anything to indicate that either party to the treaty contemplated grants of the soil under the water, or intended any such limitation upon the sovereign rights of New York over navigable waters within its territory, as necessarily would have resulted from the grant in private ownership of lands under water.

It would be difficult to suggest any purpose which the
high contracting parties could have had in mind which
would have been furthered by a grant to Massachusetts of
a fee in the bed of the lake. The right of Massachusetts
and her grantees to use the waters of the lake was amply
secured and protected by a clause of the treaty, which
provided that " Citizens of the Commonwealth of Massa-
chusetts shall . . . at all times hereafter have and en-
joy the same and equal Rights respecting the navigation
and fishery on and in Lake Ontario and Lake Erie and the
Waters communicating from, one to the other . . . as
shall from time to time be had and enjoyed by the Citi-
zens of the State of New York. . . ."

On the other hand, a grant of the soil under water in
private ownership would have set material limits on the
free exercise of the sovereign control of New York over
the navigable waters of the State and on the free use of
the principal waterway of the newly settled territory.
All these considerations lead to the conclusion that the
grants in the Treaty of Hartford did not convey to Massa-
chusetts, which took in private ownership, any title in
the bed of the lake, unless the technical language em-
ployed in the grants compels us to take an opposite view.

The fact that the northern limit of the grant to Massa-
chusetts was described as the international boundary, and
not the edge of the lake, is not inconsistent with our view
of the general purpose of the grant with respect to the
lands under water. A map in evidence antedating the
treaty shows numerous islands in Lake Ontario within
the described area. It was unquestionably the purpose
to grant the right of pre-emption of all the islands, and,
in order to include them, it was necessary to extend the
description to the international boundary line. More-
over, it was the avowed purpose of the treaty to settle
all controversies with respect to the area described, and
these included conflicting claims of sovereignty as well as

disputes with respect to proprietary rights. It was necessary, therefore, to make the international boundary a descriptive term in the grants and reservations whereby sovereignty and jurisdiction over the entire tract were being adjusted.

It is a principle derived from the English common law and firmly established in this country that the title to the soil under navigable waters is in the sovereign, except so far as private rights in it have been acquired by express grant or prescription. *Shively* v. *Bowlby,* 152 U. S. 1. The rule is applied both to the territory of the United States (*Shively* v. *Bowlby, supra*) and to land within the confines of the States whether they are original States (*Johnson* v. *McIntosh, supra; Martin* v. *Waddell, supra*) or States admitted into the Union since the adoption of the Constitution. *United States* v. *Holt State Bank,* 270 U. S. 49. The dominion over navigable waters, and property in the soil under them, are so identified with the exercise of the sovereign powers of government that a presumption against their separation from sovereignty must be indulged, in construing all grants by the sovereign, of lands to be held in private ownership. *Martin* v. *Waddell; Shively* v. *Bowlby, supra.* Such grants are peculiarly subject to the rule, applicable generally, that all grants by or to a sovereign government, as distinguished from private grants, must be construed so as to diminish the public rights of the sovereign only so far as is made necessary by an unavoidable construction. *Charles River Bridge* v. *Warren Bridge,* 11 Peters, 420, 544–548; *Shively* v. *Bowlby, supra.* It follows that, wherever there is a grant by a State having plenary power to make it, of the rights and title of government and sovereignty over a specified territory, or where, in a grant of land to be held in private ownership by one State within the limits of another, there is a reservation to the grantor State of these sovereign rights, the grant or reservation carries with it, as an incident, title to lands under navigable waters.

The precise question now under consideration was before this court in *Martin* v. *Waddell, supra.* This case involved the title to lands under tidal waters within the territorial limits of New Jersey, which were embraced within the territory granted by royal charters to the Duke of York. By successive conveyances, these lands had been transferred to twenty-four individuals, the Proprietors of East New Jersey, who were invested with the plenary rights and powers of government and ownership which had been conferred on the Duke of York by the original grants. In 1702, by formal instrument, the Proprietors surrendered to the Crown all their rights and powers of government, retaining their rights of private property in the granted territory.

It was held, in an opinion by Chief Justice Taney, that the relinquishment by the Proprietors to the Crown, of the rights and powers of government vested in them, carried with it as an incident the title to land under tidal waters; that that title and ownership had passed to the State of New Jersey as an incident to its sovereignty over the territory embraced in the royal grants, and excluded all claims of title to lands under navigable waters by those claiming under grants by the Proprietors. The reasoning of the opinion was addressed wholly to the proper interpretation to be placed upon grants or reservations of rights of sovereignty with respect to their operation to transfer title of lands under navigable waters; and it is decisive of this case. It compels the conclusion, which is supported by every consideration that could throw light upon the purpose and intent of the Treaty of Hartford, that the proper construction of the technical language of the treaty (which both granted and reserved to New York the right and title of sovereignty and jurisdiction over the area described) gave to New York, as incident to its sovereignty, title to all lands under navigable waters. See *Pollard's Lessees* v. *Hagan,* 3 How. 212; *Coxe* v. *State,* 144 N. Y. 396, 406.

We pass now to the contention of Massachusetts that, even if it did not acquire title to the bed of the lake, it did acquire title to the shore of the lake by the Treaty of Hartford, and that it is entitled to the benefit of all accretion to the shore because it has never parted with its title. This contention depends upon the interpretation of the language of its grant to Phelps and Gorham, of lands bounded by a line described as extending " to the Shore of the Ontario Lake; thence eastwardly along the Shores of the said lake "; and it can be sustained only if we conclude that, nothwithstanding the nature of the grant and the circumstances under which it was made, Massachusetts, after its execution, retained a narrow and undefined ribbon of land extending some forty miles along the lake front, north of the Phelps and Gorham grant, and separating the latter from the lake.

That grant embraced more than two million acres of unsettled land, for the development of which access to the lake was essential. It was made pursuant to the agreement of 1787 between Massachusetts and Phelps and Gorham to convey to them *all* of the property which Massachusetts had acquired under the Treaty of Hartford and pursuant to the Treaty of the Five Nations with Phelps and Gorham of July 8, 1788, purporting to extinguish the Indian claims to "All that territory or Country of land lying within the State of New York contained within & being parcel of the lands and territory, the right of pre-emption of the soil whereof from the native Indians was ceded by the State of New York " to Massachusetts by the Treaty of Hartford. There is no conceivable purpose for which it could be supposed that Massachusetts intended to retain such a proprietary interest in the shore as is now claimed, or to deny to its grantees and to settlers in the granted territory access to the great natural waterway upon its northern boundary. We are not dealing here with the disposition of the *jus publicum*, but with

land held by Massachusetts in private ownership and
granted by it to private persons. See *Georgia* v. *Chatta-
nooga*, 264 U. S. 472. It would require clear and un-
equivocal language so to limit the obvious general purpose
and effect of the grant.

In order thus to restrict its operation, Massachusetts
relies on the use of the words " to the Shore " and " along
the Shores," instead of " to the lake " and " along the
lake," which concededly would have carried to the water's
edge; and it is argued that the same effect must be given
to these words as when they are used in conveyances
granting land bounded by the shore of tidal waters. In
this connection, it should be observed that in the Treaty
of Hartford the words " shore " and " lake " were used
synonymously, their choice being determined by con-
venience of expression. For example, the western bound-
ary in the treaty was described as running from the inter-
national boundary line in the middle of Lake Ontario " to
the South Shore of Lake Ontario " and thence continuing
south " to Lake Erie." In each instance it is clear that
the margin of the Lake was intended, and it was not meant
by the particular use of these phrases to exclude " the
shore " from the grant.

The " seashore " is that well defined area lying between
high water mark and the low water mark, of waters in
which the tide daily ebbs and flows. The fact that by the
English common law, and by the law of those States
bounded by tidal waters, the public has rights in the sea-
shore, and that grants extending only to the high water
mark of such waters nevertheless give access to the sea,
accounts for the rule, generally recognized and followed,
that a grant whose boundaries extend to the " shore " or
" along the shore " of the sea, carries only to high water
mark. *Howard* v. *Ingersoll*, 13 How. 381; *Storer* v. *Free-
man*, 6 Mass. 435; *Shively* v. *Bowlby, supra*; *Kean* v. *Stet-
son*, 5 Pick. 492; *Cortelyou* v. *VanBrundt*, 2 Johns. 357.
But the word " shore," even in its application to tidal

waters, is subject to construction by the terms of the deed and surrounding circumstances, and may mean the water's edge at low water mark; *Storer* v. *Freeman, supra; Hathaway* v. *Wilson,* 123 Mass. 359; *Haskell* v. *Friend,* 196 Mass. 198.

The application of that rule to conveyances of land bordering upon non-tidal waters is supported neither by reason nor by authority. The lack of clear definition, by natural land marks, of the shore of non-tidal waters, would make its application impracticable. It would deny to grantees all access to such waters except on the irregular and infrequent occasions of flood, since there are no public rights in the shores of non-tidal waters, and the abutting owner could not cross the shore to the water without trespass. Such a result would contravene public policy and defeat the intention with which such conveyances are normally made. New York has consistently refused to apply the rule to non-tidal waters, holding that a conveyance "to the shore" or "along the shore" of such waters carries to the water's edge at low water, *Child* v. *Starr,* 4 Hill. 369, 375–6; *Halsey* v. *McCormick,* 13 N. Y. 296; *Yates* v. *Van De Bogert,* 56 N. Y. 526; *Stewart* v. *Turney,* 237 N. Y. 117, 131; and the local rules for interpreting conveyances should be applied by this Court in the absence of an expression of a different purpose. *Hardin* v. *Jordan,* 140 U. S. 371, 384; *Oklahoma* v. *Texas,* 258 U. S. 574, 594; *Brewer Oil Co.* v. *United States,* 260 U. S. 77, 88. The same rule is, however, generally followed elsewhere. See *Castle* v. *Elder,* 57 Minn. 289; *Lamb* v. *Ricketts,* 11 Ohio 311; *Daniels* v. *Cheshire R. R.,* 20 N. H. 85; *Kanouse* v. *Stockbower,* 48 N. J. Eq. 42, 50; *Seaman* v. *Smith,* 24 Ill. 521; *Slauson* v. *Goodrich Transp. Co.,* 94 Wis. 642; *Burke* v. *Niles,* 13 New Bruns. 166; *Stover* v. *Lavoia,* 8 Ont. W. R. 398.

Upon neither of the theories advanced, therefore, does the Commonwealth of Massachusetts sustain its claim to the land in question.

If any further support were required for the conclusion which we reach, it is to be found in the practical construction by the two States of the Treaty of Hartford and of the grants made by Massachusetts immediately following it, and in long continued acquiescence by Massachusetts in that construction. After the relinquishment by Phelps and Gorham to Massachusetts, of all claim to the westerly two-thirds of the land acquired by Massachusetts under the Treaty of Hartford, Massachusetts, by resolution of its legislature of March 8, 1791 (Laws & Res. 1790–1, c. 121, p. 221) bargained to sell to Samuel Ogden all the title and interest which the Commonwealth then had in the land granted to it by the State of New York, except such parts of the land as then belonged to Phelps and Gorham. Robert Morris succeeded to such rights as Ogden had under this contract. Five several conveyances to Morris, embracing the westerly two-thirds of the tract, were made by a Committee appointed for that purpose, and the report of the Committee, describing these conveyances in detail, was approved by resolution of the Massachusetts legislature of June 17, 1791 (Laws & Res. 1790–1, c. 65, p. 416). This resolution recited that the Committee had been appointed with authority " to sell & convey . . . the right of pre-emption, & other the title & interest of the Commonwealth to that part of the lands lying in the State of New-York, the right of pre-emption whereof the said State of New-York had ceded to this Commonwealth, & which had not been by them before otherwise ceded or granted." Although the descriptions in the deeds were so drawn as to exclude from their operation any lands lying east of the western bounds of the Phelps and Gorham grant, this resolution was a clear recognition by the Massachusetts legislature, (as were also the recitals in the several deeds by this Committee to Morris,) that Massachusetts retained no interest in the shore or in the

bed of Lake Ontario east of the westerly boundary of the Phelps and Gorham grant. The deed of the most easterly land conveyed to Robert Morris describes it as bounded on the north by the international boundary line and on the east by lands "confirmed to Nathaniel Gorham and Oliver Phelps," but makes no mention of any land on the east belonging to Massachusetts, as would have been appropriate if it had retained any interest in the shore line, east of the land granted to Morris.

In 1797, Morris obtained from the Indians a grant of their right to all such part of the lands ceded by New York to Massachusetts "as is not included in the Indian purchase made by Oliver Phelps and Nathaniel Gorham," and in a Resolve of the Massachusetts legislature passed March 8, 1804 (Laws & Res. 1803–4, c. 155, p. 939), this Treaty of Morris with the Indians is referred to as having been made with the authority of Massachusetts and as having extinguished all the Indian rights in the land referred to.

There is no evidence of any official act, or any expression, of the general court or the legislature of Massachusetts, or of any official of the Commonwealth, from the time of the Phelps and Gorham grant until the commencement of the present suit, which suggests that Massachusetts had reserved or retained any interest whatever in land under Lake Ontario or upon its shores within the boundaries of that grant. So far as appears, the public authorities of New York have continuously treated the property as other property in the State and as not encumbered by any claim or title of the Commonwealth of Massachusetts.

Long acquiescence in the possession of territory and the exercise of dominion and sovereignty over it may have a controlling effect in the determination of a disputed boundary. *Indiana* v. *Kentucky,* 136 U. S. 479; *Michigan* v. *Wisconsin,* 270 U. S. 295. Even though the Treaty of

Hartford provided " that no adverse possession of the said lands for any length of time shall be adjudged a disseisin of the Commonwealth of Massachusetts," it does not affect the interpretation by Massachusetts of her own deeds and acts, or her long continued acquiescence in that interpretation, as persuasive, if not conclusive, evidence of the correctness of the construction which we place upon the deeds themselves.

The complainant has failed to sustain its claim of title to the land in question. The decree will therefore be for the defendants, and, since no public boundary or public ownership was involved, costs are awarded against the complainant. The parties, or either of them if so advised, may, within thirty days, submit the form of a decree to carry this opinion into effect; failing which a decree dismissing the bill, with costs to the defendants, will be entered.

*It is so ordered.*