## VERMONT *v.* NEW HAMPSHIRE.

No. 2, Original.   Argued April 20, 21, 1933.—Decided May 29, 1933.

Mr. *Warren R. Austin,* with whom *Messrs. Lawrence C. Jones,* Attorney General of Vermont, and *Warren R. Austin, Jr.,* were on the brief, for plaintiff.

Mr. *Charles E. Hughes, Jr.,* with whom *Messrs. Francis W. Johnston,* Attorney General of New Hampshire, *Jeremy R. Waldron, John Fletcher Caskey,* and *Charles A. Wallace* were on the brief, for defendant.

Mr. Justice Stone delivered the opinion of the Court.

This is an original suit, brought by the State of Vermont December 18, 1915, for the determination of the boundary line between that state and the State of New Hampshire. By the amended bill of complaint Vermont alleged that the boundary is " the thread of the channel " of the Connecticut River for its entire course, except for that part from the northerly limits of the town of Vernon, Vermont, south to the Massachusetts line where it " is the west bank of Connecticut River at low-water mark." In the original bill of complaint there was an alternative

claim that if this Court should be of the opinion that the boundary is not the thread, but is "the west bank of the Connecticut River," then, "such line is the westerly edge of the waters of the Connecticut River at its average and mean stage during the entire year without reference to the extraordinary freshets or extreme droughts." New Hampshire, by its amended answer, asserts that the boundary is "at the top or westerly margin of the westerly bank of the Connecticut River and the east branch thereof."

Vermont's claim of a boundary at the thread of the channel was based upon the following propositions: Township grants made by the Governor of the Province of New Hampshire, by royal authority, between 1741 and 1764, on the west side of the Connecticut River in the territory now Vermont, were bounded by the river, which was non-tidal, and carried title to its thread by virtue of the common law of England; an order of the King-in-Council of July 20, 1764, fixing the boundary between the Provinces of New York and New Hampshire at the "western banks of the River Connecticut," thus including the territory now Vermont in the Province of New York, was nullified by the successful revolution of the inhabitants of the New Hampshire Grants; hence the eastern boundary of the revolutionary state of Vermont was the same as the eastern limits of the township grants, namely, the thread of the river; Vermont was admitted to the Union as a sovereign independent state with her boundaries those established by her revolution. Her eastern boundary was therefore the thread of the Connecticut River.

The Special Master sustained all these contentions except the last one. With respect to it he found that Vermont had, by resolution of her legislature of February 22, 1782, relinquished any claim to jurisdiction east of the west side of the river, at low-water mark, in conform-

ity to a Congressional resolution of August 20, 21, 1781 prescribing terms upon which Congress would consider the admission of Vermont to the Union. In addition to the findings already indicated the Special Master also concluded that the order of the King-in-Council of July 20, 1764, even if not rendered ineffective by the revolution of Vermont, was not intended to recognize any rights of New Hampshire west of the west side of the river at low water; that Vermont's claim of a boundary at the thread of the river would be defeated by her acquiescence in New Hampshire's exercise of dominion over the waters of the river even if it had not been relinquished by acceptance of the resolutions of Congress of August, 1781, and finally that by practical construction of the two states by long usage and acquiescence, the boundary of Vermont was fixed at the low-water mark on the west side of the river.

Accordingly the Special Master found that:

" The eastern boundary of the State of Vermont upon her admission to the Union was that stated in the resolutions of Congress of August 20, and 21, 1781, and in the resolution of the Vermont legislature of February 22, 1782, and this I find to be the low-water mark on the west side of the Connecticut River."

The line of low-water mark thus specified was further defined as " the point to which the river recedes at its lowest stage without reference to extreme droughts," and no exception has been taken to this definition.

Vermont's claim of a boundary to the thread of the channel is no longer before us as New Hampshire alone has filed exceptions to the report of the Special Master. Those exceptions narrow the issue to the single question whether the boundary line is at low-water mark on the west side of the river as the Master found or at the top or westerly margin of the bank as contended by New Hampshire; in other words, whether New Hampshire acquired and retained jurisdiction of a narrow ribbon of land

of varying width on the west side of the Connecticut River, extending along the entire eastern boundary of Vermont, which at some stages of the river is submerged and at others left uncovered by the water. In support of this contention New Hampshire relies on the order of the King-in-Council of 1764, which it is argued established the eastern boundary of Vermont at the west bank of the Connecticut River, not at low-water mark, but at the top of the bank or the line upon it where vegetation ceases.

The Order-in-Council must be considered in the light of the colonial history out of which it grew, which is elaborately reviewed in the Special Master's report. The royal Province of New Hampshire was established on September 18, 1679, by commission of Charles II, establishing the president and council of that province. On July 3, 1741, Benning Wentworth was appointed Governor by George II. His commission, like that later issued to him by George III in 1760, defined the western boundary of the province only by the provision that its south line and its north line should extend westward " till it meets with our other governments." The government on the west of New Hampshire was the Province of New York, originating in the grant of June 29, 1674, by Charles II to his brother James, Duke of York, which included " all the lands from the west side of Connecticut river to the east side of Delaware Bay." This grant merged in the Crown when James, Duke of York, became King James II in 1685.

Despite the language of the New York grant fixing its eastern boundary as the west side of the Connecticut River, that province did not assert jurisdiction as far east as the Connecticut River at any point south of the New Hampshire line. The western boundary of the Province of Connecticut was fixed about 1684 with the acquiescence of New York as a line, approximately north and south, twenty miles east of the Hudson River, and before 1750

Massachusetts had settled westerly to about the same line and New York had made no attempt to disturb those settlements.

Governor Wentworth, construing his commission as extending the Province of New Hampshire westwardly at least to this line east of the Hudson River, acting under authority of a royal commission, made, from about 1752 to 1764, numerous grants of townships in the territory west of the Connecticut River, now a part of Vermont. Each of these grants comprised a territory six miles square and conferred on the inhabitants authority to organize town governments. Twenty-three of the towns were adjacent to the Connecticut River, and with the exception of Vernon, which extended across the river at the southeastern corner of the present State of Vermont, the boundary line of these townships was described expressly or by implication as extending to or beginning at a tree or other designated monument standing on the westerly side or the west bank of the river and extending " thence up the river " or " thence down the river." At the time of these grants the river was extensively used by the inhabitants on both sides for hunting and fishing.

The Special Master, upon an exhaustive examination of the evidence and the law, concluded that these boundaries were on the river and, with the exception of the town of Vernon, carried the boundary of the townships to the thread of the river. Although this conclusion is challenged by the exceptions filed in behalf of New Hampshire, it is not denied that the boundary in the description of the New Hampshire township grants carried at least to the river.

In 1749, before the township grants before us were made, a controversy had arisen between the Royal Governors of New Hampshire and New York over their respective authority to make grants in the territory between the Hudson and Connecticut rivers. Although sus-

pended during the French and Indian wars, the conflict was renewed at the end of 1763 and in 1764 was submitted to the King-in-Council for determination. New York asserted that under the grant to the Duke of York, that province included " all the lands from the west side of Connecticut River." New Hampshire claimed that its boundary extended to the line approximately twenty miles east of the Hudson corresponding roughly to a prolongation northerly of the westerly boundaries of Massachusetts and Connecticut. The controversy was referred to the Lords of Trade, who made their report of July 10, 1764. Their recommendation was approved by the order of the King-in-Council, on July 20, 1764, which fixed the boundary in the following language:

" His Majesty, . . . doth accordingly, hereby order and declare the western banks of the River Connecticut, from where it enters the Province of the Massachusetts Bay, as far north as the forty-fifth degree of northern latitude, to be the boundary line between the said two Provinces of New Hampshire and New York."

As it is conceded that the King-in-Council had authority to fix the boundary between the two royal provinces, the meaning and effect of the order of 1764, must first be considered. The Special Master concluded that the purpose and effect of the order were to leave undisturbed the boundary of New York as established by the grant to the Duke of York of all the lands from the west side of the Connecticut River; that the boundary fixed was therefore at the river and not at some point upon its bank. We think this conclusion correct.

New Hampshire contends that the designation of the " western banks " of the river as the boundary established a " bank " boundary above low-water mark as distinguished from one upon the river which admittedly would carry at least to low water. But the language of the order was adopted to express a judgment upon conflicting

claims, each clearly defined, neither of which involved the question whether the line was to be drawn at low water or at some point above. New York, relying on the Duke of York's grant, contended that its jurisdiction extended to the Connecticut River and not, as New Hampshire argued, to the line about twenty miles east of the Hudson, continuing that which marked the boundary of Massachusetts and Connecticut. In the entire history of the controversy there appears to have been no suggestion that the jurisdiction of New York would not extend to the Connecticut River if it were found to extend east of the western boundary of Connecticut and Massachusetts. Thus the written statement of January 20, 1764, presenting the claims of New York to the Lords of Trade stated that "This Province is bounded eastward by Connecticut River" and the Lords of Trade in their report informed the Crown that "Your Majesty's Lieutenant Governor of New York contends that . . . 'the Province of New York does, both by the words and construction of the grant to the Duke of York, extend eastward as far as Connecticut River.'" This was the claim in favor of which the Lords of Trade decided.[1] True, they recom-

---

[1] In the Report of the Lords of Trade of 1764 the arguments said to have been advanced by the Governor of New York in support of his boundary claim are, in addition to the language of the Duke of York's Grant, that "the River Connecticut is in all respects the most certain and proper boundary; that it will be more convenient that the lands to the Westward of that river should be included in New York, because Hudson's River being navigable by Vessels of considerable Burthen to Albany, the Trade of that part of the Country will probably center there, to which place the Transportation or Carriage will be much easier, than to the Ports of New Hampshire, and where the Inhabitants are likely to meet with a better Market for their produce; that as the Quit Rent in New Hampshire is but one shilling the hundred Acres, and that of New York, two shillings and six pence, the revenue to your Majesty, if the Lands are settled under New York, will be greater than if granted under New Hampshire; and that there is another Circumstance of great weight at this Juncture, and operat-

mended that "The western banks of the River Connecti-
cut from where it enters the Province of the Massachu-
setts Bay as far north as the forty-fifth degree of northern
latitude should be declared to be the boundary line be-
tween the two Provinces." But the evidence is conclu-
sive that there was no thought that the designation of
the banks as the boundary would have a different effect
than the designation of the river itself. A communication
from the Lords of Trade to Lieutenant Governor Colden
of New York with respect to the boundary dispute, July
13, 1764, three days after their report to the Crown, ad-
vised him that "as the reasons you assign for making
Connecticut River the boundary line between the two
provinces appear to us to have great weight, we have
adopted and recommended that proposition." In adopt-
ing the reference to the banks of the river contained in
the recommendation of the Lords of Trade the Order-in-
Council did not give it any different meaning.[2]

---

ing in favor of this proposition, which is, that a great number of
reduced Officers have located their Claims to Lands under Your
Majesty's Proclamation in this part of the Country, and were willing
to take out Grants for the same under the Province of New York,
but absolutely decline any application to the Government of New
Hampshire." The Lords of Trade advised that these "arguments
urged by the Lieutenant Governor of New York in support of his
proposition, appear to us to have great weight, if not absolutely to
decide upon the Question; and the only probable inconvenience, that
is stated to arise from making the River Connecticut the boundary
line between the two Provinces, is the effect which the limitation of
New Hampshire, to narrower Limits than is contended for, may have
to disable them from making such a provision for its establishment as
may be necessary to support it as a separate Government; But as we
humbly apprehend, that the great extent of this Province to the
Northward leaves sufficient room for much further improvement and
Settlement, this objection does not appear to us to be of sufficient
weight to counterbalance the convenience and advantage that seems
to attend the other proposition; . . ."

[2] Compare the Proclamation of Lt.-Gov. Colden of New York of
December 28, 1763 declaring "that the province of New York is

Subsequent events attest the validity of this conclusion. After the receipt of the order by the Governors of New Hampshire and New York, and the publication of its terms, it was interpreted by three governors of New York, Moore, the Earl of Dunmore and Tryon,[3] to establish the river as the eastern boundary of the province and, except for a petition of New Hampshire to the Crown in 1771 for a rescission of the order, the royal governments of both provinces recognized its validity up to the time of the revolution. In reporting to the Crown December 3, 1772, upon New Hampshire's petition for rescission, the Lords of Trade recommended adherence to "those principles of true policy and sound wisdom which appear to have dictated the proposition of making the River Connecticut the boundary between the two colonies." And the response of the Governor of New Hampshire to a questionnaire sent out by the Lords of Trade in 1774, recited that ". The River Connecticut from Hinsdale runs through this Province, and is its boundary to the 45° of north latitude. . . ."

As we have said, New Hampshire admits that a boundary on the river or including lands west of the river would normally carry at least to low-water mark. *Handly's Lessee* v. *Anthony*, 5 Wheat. 374; *Thomas* v. *Hatch*, 3 Sumner 170; see *Oklahoma* v. *Texas*, 260 U.S. 606, 27; *Massachusetts* v. *New York*, 271 U.S. 65, 93. But the contends, relying upon the rule said to have been laid down in *Howard* v. *Ingersoll*, 13 How. 381, and followed

bounded to the eastward by the River Connecticut" and commanding "all judges, justices and other civil officers within the same, to continue to exercise jurisdiction in their respective functions as far as to the banks of Connecticut River, the undoubted eastern limits of that part of the province of New York, notwithstanding any contrariety of jurisdiction claimed by the Government of New Hampshire."

[3] See letters of Governor Moore to the Earl of Shelbourne, June 9, 1767, the Earl of Dunmore to the Earl of Hillsborough, July 20, 1764, Governor Tryon to the Rev. Mr. Dewey, May 19, 1772.

in *Oklahoma v. Texas, supra,* that the designation of the banks of the river as the boundary rather than the river itself necessarily implies that the line is higher upon the bank than low-water mark, stated in brief and argument to be the place where vegetation ceases.

Obviously the meaning of the words of the order could not be established by a rule of law declared long after its promulgation; and nothing in the decisions relied upon by New Hampshire admonishes us to disregard that meaning when, as here, it is clearly established. In the *Ingersoll* case the court held that lands ceded by Georgia to the United States, situated " west of a line beginning on the western bank of the Chattahoochie River " and " running . . . along the western bank thereof " were bounded by a line governed by the " permanent fast land bank " and not by low-water mark. The court emphasized the fact that uncertainty which might be created by the use of the word bank alone, as in the order before us, was removed by the additional phrase running " along the bank " which was thought to have a popular significance excluding " the idea that a line was to be traced at the edge of the water as that may be at one or another time or at low water or at the lowest low water." (pp. 415, 417.) See also *Alabama v. Georgia,* 23 How. 505. *Oklahoma v. Texas, supra,* held that a treaty, interpreted to designate a boundary " along the south bank " of the Red River, (260 U.S. pp. 624, 626), fixed the line at a point on and along the bank rather than at low-water mark.[4]

---

[4] Upon the argument of the present case it was conceded that the flow of the Connecticut River, always of substantial volume, is confined by precipitous banks extending to or near the water at all normal stages of the river, except for relatively small stretches where the banks are low and overflowed at high water. It does not appear that there are flats of any substantial area lying between the precipitous banks and the water at its lowest stage or that the river has shifted its bed to any material extent at any time. In all these respects the physical characteristics of the Connecticut River differ from those of the Red River, described in *Oklahoma v. Texas, supra,* 634, 635.

At most the decision may be thought to establish a rule of interpretation which must govern in the absence of affirmative evidence that the language used was intended to have a different meaning, for the Court was careful to say that the conclusion reached " has full confirmation in available historical data respecting the negotiations which attended the framing and signing of the treaty." (p. 632.) Here, it is apparent on the face of the documents that the language of the order was not used with the intention of fixing a line upon the bank above low-water mark; and the history of the controversy clearly establishes that the intention of the order was to confirm and not to change the boundary as fixed by the grant to the Duke of York of " all the lands on the west side of Connecticut River."

We cannot disregard this history without disregarding decisions of this Court, which establish either expressly or by example that in the interpretation of a treaty or grant between two states for the settlement of boundary dispute the nature and history of the controversy must be considered. *Massachusetts* v. *New York, supra; Martin* v. *Waddell,* 16 Pet. 367, 411. Upon considerations of this nature we held in *Massachusetts* v. *New York, supra,* that the words " shore " and " lake " used in the treaty of Hartford of 1786 in defining the boundary of New York and Massachusetts, were synonymous and the boundary upon the shore was fixed at low-water mark on Lake Ontario.

Moreover, in the present case, it must be remembered that the governors of New Hampshire and New York were contesting each other's authority to grant land west of the Connecticut River and jurisdiction over the lands already granted there. It would be difficult to conclude that in settling that dispute it was intended to deny to New York or the grantees lawful access to the river at any of its usual seasonal states; and inasmuch as there are no public rights in the shores of non-tidal waters,

the abutting owner, on the view insisted upon by New Hampshire, could not cross the bank to the water without trespass. Compare *Massachusetts* v. *New York, supra,* 93. Like a treaty or grant fixing the boundary between states the Order-in-Council is to be construed " with a view to public convenience and the avoidance of controversy." *Handly's Lessee* v. *Anthony, supra,* 383. As was said by Chief Justice Marshall in *Handly's Lessee* v. *Anthony, supra,* 380:

" Even when a State retains its dominion over a river which constitutes the boundary between itself and another State, it would be extremely inconvenient to extend its dominion over the land on the other side, which was left bare by the receding of the water. And this inconvenience is not less where the rising and falling is annual, than where it is diurnal. Wherever the river is a boundary between States, it is the main, the permanent river, which constitutes the boundary; and the mind will find itself embarrassed with insurmountable difficulty in attempting to draw any other line than the low water mark."

It is true that a different rule has been applied in the case of grants bounded by tidal waters, which carry only to high-water mark. *Shively* v. *Bowlby,* 152 U.S. 1; *Maryland* v. *West Va.,* 217 U.S. 577; *Smoot Sand & Gravel Corp.* v. *Washington Airport,* 283 U.S. 348. But as was pointed out in *Massachusetts* v. *New York, supra,* 93, such grants, since they carry to tidal water, and since the public has rights in the foreshore, do not deny access to the sea, and even grants of this class may, by construction, be deemed to carry to low-water mark where the surrounding circumstances show that such was the boundary intended.

Our conclusion as to the meaning and effect of the Order-in-Council of 1764 would be decisive of the boundary of Vermont upon her admission to the Union were it not for the history of Vermont as a revolutionary govern-

ment and the consequent uncertainty whether she was admitted under the second clause of Article IV, § 3, of the Constitution as a new state formed out of the territory of New York, with her boundary accordingly determined by that of New York, or whether she was admitted under the first clause of Article IV, § 3, as an independent revolutionary state with self-constituted boundaries.

The Special Master found that attempts by the New York authorities after 1764 to interfere with the possession of the holders of the New Hampshire Grants made prior to the Order-in-Council led to protest and forcible resistance which assumed the proportions of a revolutionary movement. This movement culminated in 1777 in the Declaration of Independence by the towns comprising the New Hampshire Grants on both sides of the Green Mountains, which proclaimed that the jurisdiction granted by the Crown " to New York government over the people of the New Hampshire Grants is totally dissolved " and that a free and independent government is set up within the territory now Vermont, bounded " east on Connecticut River . . . as far as the New Hampshire Grants extends." From that time until the admission of Vermont into the Union in 1791 an independent government was maintained with defined geographical limits extending on the east to the Connecticut River. In view of these facts the Special Master concluded that the Order-in-Council was nullified by successful revolution, and Vermont was admitted as an independent state with self-constituted boundaries. But he also found, as we have said, that Vermont's claims of jurisdiction to the thread of the river were restricted to the low-water mark on the western side by resolutions of Congress of August 20, 21, 1781, and their acceptance by resolution of the Vermont Legislature, February 22, 1782. In addition, he found that Vermont was not recognized as an independent state by Congress either under

608

the Articles of Confederation or under the Constitution, but that her independence was recognized by New Hampshire in 1777, by Massachusetts in 1781, and by New York in 1790. The latter finding is contested by New Hampshire as is his conclusion of law that even if Vermont was not recognized as an independent state prior to her admission to the Union, her status as a revolutionary state may be determined by this Court where necessary to the settlement of a boundary dispute between two states.

Under the circumstances of the present case the questions raised by these conclusions of the Special Master and the contentions of New Hampshire with respect to them need not be decided. For New York, by Commissioners acting under a resolution of her legislature of March 6, 1790, gave formal consent to the admission of Vermont into the Union, and if Vermont was admitted as a state carved out of the territory of New York her boundaries on the east were those of New York, as fixed by the Order-in-Council. If admitted as a free and independent state her boundaries were those fixed by her own declaration of independence as limited by her acceptance of the conditions of the Congressional resolution of August 20, 21, 1781. That boundary we conclude was also one carrying to the river and to low-water mark.

Following Vermont's declaration of independence, and until her admission to statehood in 1791 she, from time to time, sent representatives to Congress seeking admission to the Union and published to the world numerous appeals, vindications and arguments to develop public opinion in favor of her admission. During that period New York, at times, made formal assertion of jurisdiction over the territory now Vermont. A committee report to the New Hampshire legislature of April 2, 1779, adopted by the legislature June 24, recommended that New Hampshire make claim to the whole of the New Hampshire

Grants, with the qualification that if the Continental Congress should recognize Vermont as an independent state New Hampshire would acquiesce and until Congress settled the dispute would exercise jurisdiction "as far west as the western banks of Connecticut River and no further." Vermont, on her part, attempted to annex towns in New Hampshire on the east side of the river.

After various efforts to enlist the interest of the Continental Congress in a settlement of the controversy, the Vermont legislature on June 22, 1781, adopted a report of a committee recommending the appointment of delegates to propose to Congress and receive from it terms for a union with the United States. The matter was also brought to the attention of Congress by a letter from the President of New Hampshire of June 30, 1781.

On July 31, a committee of Congress to which the matter had been referred, recommended that Congress guaranty to New York and New Hampshire their respective territory lying outside the New Hampshire Grants "in case the said states shall relinquish their respective claims to said districts called the New Hampshire Grants or the State of Vermont, bounded east by Connecticut River . . . formerly granted by the Governor of New Hampshire," a recommendation which was renewed in a further report of August 2. Congress, by resolution of August 7, reciting that New Hampshire and New York have submitted to it the decision of the disputes between them and "the people inhabiting the New Hampshire Grants on the west side of Connecticut River called the State of Vermont, concerning their respective claims of jurisdiction over the said territory" and that the parties "have been heard thereon," declared that in case Congress should recognize the independence of the people of Vermont, it would "consider all the lands belonging to New Hampshire and New York respectively without the limits of Vermont aforesaid, as coming within the mutual

guaranty of territory contained in the Articles of Confederation." And, in pursuance of the same resolution, Congress, on August 8, appointed a committee of five to confer with persons representing the New Hampshire Grants " on the west side of Connecticut River," with respect to their claim to be an independent state and the terms upon which they should be admitted to the Union, in case Congress should recognize their independence. On August 18, Vermont's representatives proposed that Vermont be recognized as an independent state with a boundary extending eastward " to the west bank of the Connecticut River; thence up the river as it tends to the 45th degree of north latitude." The same day, answering written interrogatories of the Committee of Congress, they stated that the boundaries of Vermont specified in their proposal were the same as those contained in the resolution of Congress of August 7th, in which the New Hampshire Grants were described as being " on the west side of Connecticut River."

The Congressional resolutions of August 20, 21, on which the Special Master relied, provided, in final form, " that it be an indispensible preliminary to the recognition of the independence of the people inhabiting the territory called Vermont, and their admission into the federal union, that they explicitly relinquish all demands of lands or jurisdiction on the east side of the west bank of Connecticut River. . . ." On February 19, 1782, the Vermont Assembly, in Committee of the Whole, after considering the resolutions of Congress of August 7, 20 and 21, 1781, recommended that the Assembly of the State " pass resolutions, declaring their acquiescence in, and accession to, the determination made by Congress of the said boundary lines, between the states of New Hampshire and New York, respectively, and this state, as they are, in said resolutions, defined and described, and also, expressly relinquishing all claim to and jurisdiction of, and

over, the said districts of territory without said boundary lines." On February 22, 1782, the Legislature, after reciting the quoted recommendation of the Committee of the Whole, resolved that it be complied with and " that the west bank of Connecticut River " and a specified boundary on the New York side of the state " shall be considered as the east and west boundaries of this state "; any claim to jurisdiction over all territory " without said boundary lines " was formally relinquished. On April 17, 1782, a committee of Congress to which the matter had been submitted reported that the Congressional resolutions of the 20th and 21st of August had been fully complied with, and recommended that the territory of Vermont as defined in these resolutions be recognized and admitted to the Union, as a free and independent state.

But action by Congress was postponed and no further progress was made towards the admission of Vermont until July 16, 1789, when the New York legislature passed an act, reaffirmed March 6, 1790, authorizing the appointment of commissioners with power to declare, upon such terms as they might think proper, the consent of New York to her admission. Vermont in turn appointed commissioners to treat with the representatives of New York. Their negotiations resulted in agreement between the two states as to the eastern boundary of New York and payment by Vermont to New York of the sum of $30,000 for the relinquishment of all claims of sovereignty by New York, and for the confirmation of the New Hampshire township grants. In 1791 the matter of admission was again presented to Congress by commissioners selected for the purpose under resolution of the Vermont legislature of January 20, 1791, and the admission of Vermont followed by Act of Congress of February 18, 1791.

The acceptance by the Vermont Legislature on February 22, 1782, of the resolutions of Congress of August 20, 21, 1781, requiring the relinquishment by the inhabitants

of Vermont of " all demands of lands or jurisdiction on the east side of the west bank of Connecticut River," operated to relinquish any claim on the part of Vermont to jurisdiction to the thread of the river in the territory of the New Hampshire Grants as defined by their declaration of independence. We think it also operated to confirm the eastern boundary of Vermont as a boundary extending to the river as it.had been fixed by the Order-in-Council of 1764. It is true that the resolution of acceptance of the Vermont Legislature named " the west bank of Connecticut River " as the boundary, but it cannot be supposed that it was intended by this language to relinquish any greater jurisdiction than Congress required Vermont to surrender—that " on the east side of the west bank." And the terms of the Congressional resolution cannot be interpreted without regard to the previous negotiations including the proposal of the Vermont representatives of 1781 designating the west bank as the boundary and their statement of the same date that the boundary intended was the same as that contained in the Congressional resolution of August 7th in which the New Hampshire Grants were described as being " on the west side " of the river. When the negotiations are considered as a whole, the conclusion is irresistible that the sole controversy with respect to the boundary line was whether Vermont had extended her boundary eastward beyond the line at the river established less than a generation earlier [5] by the Order-in-Council of 1764. Congress required the relinquishment of any claims to such an extension but we cannot say that it required more without ignoring the language of the negotiations as well as the history of the Order-in-Council, already detailed. Moreover, the con-

[5] The Order-in-Council was specifically referred to in the resolution of Congress of August 7, as having " superseded the pretensions of New Hampshire in favor of New York " and having been " assented to on part of the former."

siderations of practical convenience which fortify the conclusion that the boundary fixed by the order carried to the river lead to the like conclusion that the boundary intended by the resolutions of Congress and of the Vermont Legislature to be that of Vermont upon her admission into the Union, was a boundary on the river carrying to normal low-water mark.

New Hampshire does not appear to have assented formally to the resolutions of Congress of August 20, 21, 1781, but she was represented by agents before the Congressional Committee on whose reports of July 31 and August 2, the resolution was, in part, based. Both they and the New Hampshire representatives in Congress were familiar with the terms of the resolutions and could not have been unaware of the fact that in all the formal representations made to Congress in behalf of Vermont and in the various reports and resolutions of committees and the resolutions of Congress itself, the eastern boundary of Vermont was described interchangeably as the west side of the Connecticut River or as not extending east of the west banks of the river. Although these were public acts of notoriety, New Hampshire does not appear ever to have made any objection to these definitions of the boundary line.

The conclusion we have reached as to the correct construction of the Order-in-Council of 1764 and the resolution of Congress under which Vermont was admitted to statehood finds support in the practical construction given by both states to the boundary, thus defined, in the long continued failure of New Hampshire to assert any dominion over the west bank of the river, and in her long acquiescence in the dominion asserted there by Vermont. See *Michigan* v. *Wisconsin*, 270 U.S. 295, 308; *Indiana* v. *Kentucky*, 136 U.S. 479, 509, 511; *Maryland* v. *West Virginia*, 217 U.S. 1, 17; *Rhode Island* v. *Massachusetts*, 4 How. 591, 639. Vermont, it is true, made several

attempts to revive its ancient claim to dominion over the river to its thread, by invitations to New Hampshire to join in the appointment of commissioners to settle the boundary (Resolution of Vermont Legislature of November 6, 1792, as amended October 20, 1794; Resolution of October 25, 1830; Resolution of November 6, 1830). None of these efforts except the last appears to have provoked any formal action in behalf of New Hampshire, but in response to the resolution of November 6, 1830, the New Hampshire Legislature adopted a resolution of July 1, 1831, declining to appoint commissioners as requested, and declaring that no doubt had hitherto been entertained or suggested in relation to the boundary and that " the river Connecticut for the whole extent of the line between the two states " was " conceded to be within the limits and exclusive jurisdiction of the State of New Hampshire." No jurisdiction over the west bank was asserted.

A large amount of evidence, thought to have some bearing on the practical construction given to the boundary by the two states, has been introduced in the present suit. Most of it, when examined in detail, is of such slight weight and so inconclusive as to make unnecessary any extensive review of it here. Of some, but by no means controlling significance, are instances of action by towns in New Hampshire recognizing low-water mark on the west bank as the boundary of the towns and of the state,[6] and numerous deeds or other formal documents introduced in evidence affecting titles in each of the towns on the west bank of the river by which the property conveyed was extended to the river or included the privilege

---

[6] Authorization of the town of Stratford, New Hampshire, October 1, 1893, for laying out a highway between Stratford and Bloomfield, Vermont; Contract of April 24, 1896, between Lyme, New Hampshire, and Thetford, Vermont, for the erection of a bridge across the river between the two towns.

of the use of the water. In the absence of evidence of like character showing the assertion of title or jurisdiction in New Hampshire above the low-water line, these facts have some persuasive force in showing that inhabitants along the questioned boundary considered that it extended along the river at low-water mark. See *Handly's Lessee* v. *Anthony, supra,* 384.

Voluminous evidence was given with respect to the history of taxation by the two states of property along the contested boundary line. New Hampshire taxed thirty bridges and several dams, all structures extending across the river, but the tax records give no clear indication of any purpose or intention to tax property above low-water mark on the west bank or to do more than tax so much of it as was within the state, without reference to any defined boundary. Vermont taxed five of the bridges in varying years, the property taxed being the " abutment " to the bridge on the Vermont side, or the " end of the bridge with abutment," in several instances a fractional part of a bridge and, in one, the " end of bridge abutment to low water mark." Only in this last instance does it definitely appear that the property taxed extended to low water, although it seems probable that the abutment or the fractional part of the bridges taxed may in some other cases have extended to that point.

Of persuasive force is the fact found by the Special Master that New Hampshire appears never to have asserted definitely any right to tax land or structures located on the west side of the river before 1909 or 1912. From 1909 to 1927, New Hampshire taxed structures on the west side of the river belonging to the Connecticut River Power Company at Vernon, the property of which appears also to have been taxed by Vermont from 1916 to 1927. While it may be inferred that the property taxed by both states included structures on the west bank of the river between the high and low-water marks, the Special Master did

not so find and the fact does not clearly appear. In 1912 the New Hampshire taxing authorities taxed seven corporations, three partnerships and persons unknown having structures located on the Vermont bank of the river near Bellows Falls, at a valuation in excess of $1,000,000. The same property appears to have been taxed by Vermont, the record of taxation of some of it belonging to the Bellows Falls Canal Company, going back to a date as early as 1820. It is conceded that the property taxed included structures extending on the bank below the line of vegetation. The Special Master's finding that it was this "unprecedented" taxation by New Hampshire which precipitated the present suit is unchallenged. The fact that in the period of over a century following Vermont's admission to statehood this is the first well authenticated instance of an effort on the part of the New Hampshire authorities to tax property located on the west bank of the river is of substantial weight in indicating acquiescence by New Hampshire in the boundary line restricting her jurisdiction to the river at the low-water mark.

An important practical confirmation of this boundary line was the location in 1897 of the monument fixing the southeast corner of Vermont and the southwest corner of New Hampshire by Commissioners of the States of Vermont, New Hampshire and Massachusetts, pursuant to agreement between the three states of October 26, 1894. By the agreement it was stipulated that: "The southwest corner of the State of New Hampshire and the southeast corner of the State of Vermont on the northerly line of Massachusetts is at a point on the west bank of the Connecticut River, about two hundred and sixty-five feet northerly of the mouth of Little Meadow Brook, so called, near South Vernon Railroad Station, and directly east of a point designated on the maps of said engineers as ' Belding '; and that a substantial monument be erected as near to said corner on the westerly bank of the Con-

necticut River as is practicable, having reference to its stability." It is shown by the evidence that the point designated as " Belding " or sometimes as " Belden " was at a marker located on the line between Massachusetts and Vermont at the top of the west bank of the river. The point designated as the corner by the agreement between the states was therefore east of the top of the bank.'

The monument was placed in position under the supervision of the commissioners in 1897. Its location was approved in identical language by the Legislature of Vermont on November 15, 1900, and by the Legislature of New Hampshire on March 22, 1901, as follows: " The southwest corner of New Hampshire and southeast corner of Vermont are marked by a copper bolt in the apex of a granite block set upon a stone pier and sunk in the shore of the western bank of the Connecticut River, and its location designated by a large polished granite monument five hundred and eighty-two feet distant on the western bank of the river above high water mark." The Special Master found, upon voluminous testimony that the granite block marking the boundary was set at the low-water mark. Its location was described by the person who erected it, who testified that it was placed in position at a point marked by the Commissioners and in accordance with specifications furnished to the witness by them calling for its erection " at low water line between Vermont and New Hampshire." The monument was buried eight feet deep with the apex level with the surface of the sand so as to avoid ice and other things " running down the river." It was set at an opportune time when the river was " very low "; at that time, it was eight feet east of the shore line, and about ten or twelve feet west of the water line. This testimony is neither contradicted nor impeached. It is corroborated by a second witness and by surrounding circumstances, as well as by evidence that the monument is submerged by the water at higher stages of

the river. The monument is shown by other testimony to be seventeen feet below and 36.5 feet east of the Belding marker referred to in the agreement between the states for establishing the corner. This marker, as already mentioned, is shown to be located at the top of the bank. It is so located in New Hampshire's amended answer of October 6, 1930, which alleges that the boundary " from the ancient ' Belden ' bound, so called, on the west bank of the Connecticut River . . . is at said top or westerly margin of said [westerly] bank."

The evidence fully supports the conclusion that the monument was intended to be located at low-water mark and was in fact placed below the shore line at a point near the water's edge when the river was " very low."

After the monument had been located the Commissioners of New Hampshire filed their report to the Governor of the State. The report is undated but refers " to the action of the commissions and the boundary line and state corner established by them " as having " received the legislative sanction of the three states." In this report the following statement appears:

" The position of the southwest corner of New Hampshire having been agreed upon, as before stated, the commissioners of New Hampshire and Vermont, after careful deliberation and consultation with experts competent to advise in such matters, proceeded to mark the same in this manner. The corner is situate on the west bank of the Connecticut River, at the line where vegetation ceases, and it was difficult to place a suitable monument, that should always be visible, at this precise point, owing to the great variations in the level of the river at different seasons of the year, without incurring a large and useless expense."

New Hampshire places reliance on this language and a statement in the report of the Vermont Commissioners of July 26, 1900 that the monument was placed " at a

point where the vegetation ceases to grow " as showing that the monument was erroneously located.

In the entire history of the boundary between these two states, this appears to be the first occasion when any reference to the boundary as being " the line where vegetation ceases " is to be found in any official document. Aside from the location of the monument at such a point being inconsistent with the statement in the New Hampshire report itself that it was difficult, owing to variation in the level of the river, to place a suitable monument there, where it would be visible, this pronouncement of the Commissioners is plainly insufficient to impeach the formal declaration of the legislatures of both states that the monument had been " sunk in the shore of the western bank of the Connecticut River " or the conclusion of the Special Master that it had been placed at the point chosen and intended by the Commissioners, and that that point was at the low-water line.

It is significant, also, that no definite and certain location of the boundary has ever been continuously claimed by New Hampshire either by her public acts or by her pleadings in this suit. Her claim as originally stated in her answer that the boundary was at high-water mark was changed by amendments to a line at the top of the west bank. In brief and argument here, the contention is that the line is to be fixed at the point where vegetation ceases.

We think that the practical construction of the boundary by the acts of the two states and of their inhabitants tends to support our interpretation of the Order-in-Council of 1764, and of the resolutions of Congress and of the Vermont legislature, preceding the admission of Vermont to the Union. We conclude that the true boundary is at the low-water mark on the western side of the Connecticut River, as the Special Master has found. We adopt his definition of low-water mark, which is not challenged here,

as the line drawn at the point to which the river recedes at its lowest stage without reference to extreme droughts. The costs will be divided between the parties in accordance with the general rule in cases of this kind. *Michigan v. Wisconsin, supra,* 319; *North Dakota v. Minnesota,* 263 U.S. 583. The parties, or either of them, if so advised, may, within thirty days, submit the form of decree to carry this opinion into effect, failing which the Court will prepare and enter the decree.

*It is so ordered.*

The CHIEF JUSTICE took no part in the consideration or decision of this case.