254

Grafton,
No. 5580.

### New Hampshire Water Resources Board

*v.*

### Lebanon Sand & Gravel, Inc.

Argued March 9, 1967.
Decided October 6, 1967.

*George S. Pappagianis*, Attorney General and *R. Peter Shapiro*, Assistant Attorney General ( *Mr. Shapiro* orally ), for the plaintiff.

*Upton, Sanders & Upton*( *Mr. Richard F. Upton* orally ), for the defendant.

DUNCAN, J.   In 1955, by legislative act, the placing of fill in great ponds was prohibited, except pursuant to grant by the Governor and Council of the right to do so, "for such consideration as they deem just." Laws 1955, 244:1 ( RSA 482:41-a, 49-b ( supp ) ). See *State* v. *Stafford Company,* 99 N. H. 92. In 1959, the Legislature amended the statute to provide that payments received by the State from such grants should be credited to the appropriation for the Water Resources Board. Laws 1959, 113:1. By the same act, provision was made for conveyance by the Governor and Council, "for such consideration as they deem just," of "sand and gravel which is on the bed of any navigable water or great pond," as therein provided. Laws 1959, 113:2; ( RSA 4:40-a - 40-d ( supp ) ).

Pursuant to the 1959 statute, the defendant petitioned the Governor and Council in 1962 for permission to take sand and gravel

from the bed of the Connecticut at the mouth of the Mascoma River. The petition was granted approximately a year later, in March of 1963, conditioned upon payment of a stated consideration. The defendant then in April 1963 declined to accept the grant upon the ground that the State held no title to the bed of the river at the locus in question.

The pending action was brought in March 1965. In the interim, the defendant sold its riparian lands to a third party, after first having removed a substantial amount of gravel from the river bed adjoining its land. It is for the gravel so removed that the plaintiff seeks an accounting and compensation.

As the agreed statement indicates, the defendant grounds its defense upon conveyances traceable back to the grant by Governor Benning Wentworth to the original proprietors of Lebanon in 1741. 25 State Papers 209, *supra.* A similar grant was made on the same date to the proprietors of the town of Hartford, consisting of land on the opposite side of the river. 26 State Papers, 212-215. The grants were made pursuant to Commissions issued to the Governor by King George II in 1741, and by King George III under date of April 4, 1761. See 2 Laws of N. H. 600; 3 Laws of N. H. 241. They will be seen to be in accordance with "instructions" issued to the Governor by these monarchs, calling for the encouragement of settlements "on the Frontiers of your Province," and specifying that each township granted should "consist of about twenty thousand Acres of Land, but not to exceed Six miles Square"; and that grants to individuals should be upon specified conditions and "Quit Rents." 2 Laws of N. H. *supra,* 608, 620-622; 3 Laws of N. H. *supra,* 251, 269-271.

As the defendant points out, the grants were made at a time when the provincial government claimed jurisdiction over land west of the Connecticut River, a claim which was disputed by the Province of New York. See 7 State Papers, *pp.* 26, 27. Thus the grant of the town of Hartford on the west side of the Connecticut River was one of the "New Hampshire Grants." The parties are agreed that the dispute concerning the boundary between New Hampshire and New York was settled on July 20, 1764 by order of the King in Council, fixing the boundary as "the western banks of the river Connecticut." 7 State Papers, *p.* 62, *supra.*

During the American Revolution, the State of Vermont came into being west of the river, and as a condition of admission to the Union in 1791, she renounced any claim to jurisdiction extending east of the west bank of the river. See *Vermont* v. *New Hampshire,* 289 U. S. 593, 610-612. By the decision last cited, the boundary was fixed at "the low-water mark on the western side of the Connecticut River." *Id.,* 619.

The grant under which the defendant claims has a double aspect. It conveys a tract of land by metes and bounds to named individuals; and it also incorporates "the same," enfranchising the inhabitants with the powers of town government. The public rights so granted were subject to future modification, such as in fact occurred with respect to the town of Hartford in 1764, when the King by Order in Council fixed the boundary between New Hampshire and New York. And see 6 Laws of N. H. 209; 10 Laws of N. H. 594. After the Revolution the public rights were held by the State, as successor to the King. *Martin* v. *Waddell,* 16 Pet. 367, 410. The private rights conveyed by the Wentworth grants however were vested in the individual grantees, a circumstance recognized in *Crosby* v. *Hanover,* 36 N. H. 404, 413, where the court pointed out that a legislative change in the boundaries of a town "does not of course affect any rights in private property . . . . " See Navigable Waters, *s.* 94b, 65 C.J.S. 302.

We are here concerned with private rights in the soil under the Connecticut River, which is a question of local law. *Archer* v. *Greenville Gravel Co.,* 233 U. S. 60, 68-69. The plaintiff maintains that since the river is an inland navigable water, "retention of title and control in the State is in the best interest of the State"; and that title to the river bed should be held to be in the State, as in the case of states of the Union which were carved out of territories previously belonging to the United States. See *United States* v. *Oregon,* 295 U.S. 1, 14; Note 32 Minn. L. Rev. 484. The plaintiff recognizes that under the English law, public rights in navigable rivers were restricted to tide waters, but argues that in this country they should be deemed to extend to fresh waters which are navigable above the flow of the tide. *Barney* v. *Keokuk,* 94 U. S. 324, 327-328. Hence it is urged, the portion of the Connecticut River here in question should be classified

with "great ponds, tidelands and arms of the sea" as to which the public concededly has rights of ownership ( *Concord Company* v. *Robertson,* 66 N. H. 1 ), rather than with "small ponds and fresh waters" where private ownership exists. See *State* v. *Gilmanton,* 9 N. H. 461.

The defendant does not question that under law established in this jurisdiction, the Connecticut River at the locus in question must be considered to be navigable and subject to public easements. *St. Regis Co.* v. *Board,* 92 N. H. 164, 173; *Carter* v. *Thurston,* 58 N. H. 104; *Thompson* v. *Androscoggin Co.,* 54 N. H. 108. But it takes the position that ownership of the riparian uplands carries with it ownership to the thread of the adjoining river, under principles firmly established by our decided cases. *State* v. *Canterbury,* 28 N. H. 195, 216; *Norway Plains Co.* v. *Bradley,* 52 N. H. 86; *Sleeper* v. *Laconia,* 60 N. H. 201; *Kent* v. *Taylor,* 64 N. H. 489. See *Poire* v. *Serra,* 99 N. H. 154. See also, cases collected in Trabue, Report of the Special Master, *pp.* 45-59 ( *Vermont* v. *New Hampshire, supra* ).

The original grant under which the defendant claims was bounded on the west: "thence Down the river." 25 State Papers, *supra* 209, 210. The plaintiff suggests that this was intended to convey title only to the highwater mark. It points to the "Allowance" made by the grant "for High Ways and unimprovable Lands by Rocks, Ponds, Mountains, and Rivers, One Thousand and Forty Acres free," as an indication that the river itself was not within the grant. However the grant was upon condition that every grantee should improve and settle his grant by "cultivations" on penalty of forfeiture of his share; so that it appears to us that the "Allowance" in question was made to assure ample acreage suitable for cultivation, and was not a reservation to the grantor of acreage not intended to be granted.

The plaintiff's argument, that the principle that a grant bounded by a river conveys title to the thread of the stream ought not to apply to grants bordered by navigable rivers, might carry weight in a case of first impression. However it finds no support in the decided cases. The argument is that because in this country navigability is considered to extend beyond tide waters, to fresh waters navigable in fact, therefore the courts must be considered to have "rejected the [English] Common Law view that title to the bed

of a river not affected by the ebb and flow of the tides lies with the riparian owner to the thread of the stream." See 3 American Law of Property, *ss.* 12.27, 12.28; 2 Tiffany on Real Property, *s.* 661.

This contention meets overwhelming refutation in the cases. The case of *Connecticut River Lumber Co.* v. *Olcott Falls Co.,* 65 N. H. 290 is particularly apposite, since the defendant in that case claimed riparian title to land on the Connecticut close by the land in question in this case, by virtue of conveyances deriving from the grant upon which the defendant in this case also relies. There the plaintiff, with the Attorney General joined as a party by amendment, sought to enjoin the defendant from maintaining a dam without sluice-ways suitable to permit flotation of the plaintiff's logs. Holding that the channel of a public navigable river is properly described as a public highway, the court observed: "The Connecticut River is a natural highway for floating logs." *Id.,* 377. "At Olcutt falls the public has a right of passage for logs as free and convenient as would be afforded by the river in its natural condition . . . . " *Id.* The dual rights which arose under royal grants were described by quotations from *Com.* v. *Alger,* 7 Cush. 53, 82, 83, 90 thus: "Two distinct rights are regarded, viz. (1) The *jus privatum*, or right of property in the soil, which the king may grant, and which may be held by a subject, and the grant of which will confer on the grantee such privileges and benefits as can be enjoyed therein, subject to the *jus publicum;* (2) The *jus publicum,* the royal prerogative by which the king holds such shores and navigable rivers for the common use and benefit [which] cannot be transferred to a subject . . . by mere royal grant, without an act of parliament." *Id.,* 387, 388. Hence the court concluded: "When the soil under the Connecticut at Olcott falls passed from the king or the state to the first grantees (under whom the defendants claim), it did not cease to be subject to the [public] easement . . . [T]he public right of way . . . is a right to a way of which the floating capacity of the undiverted river, in its natural channel, is the measure. The defendant's right is to use the river and its bed without an invasion of the public easement. Both rights are established by law." *Id.,* 389, 390. See also, *Concord Company*

v. *Robertson,* 66 N. H. 1, 6, 14; *State* v. *Sunapee Dam Company,* 70 N. H. 458, 460.

We see no reason to doubt that under the decided cases the Wentworth grant under which the defendant claims operated to convey private rights in the bed of the river to its thread. *Connecticut River Lumber Company* v. *Olcott Falls Company,* 65 N. H. 290, *supra; Sleeper* v. *Laconia,* 60 N. H. 201, *supra; Kent* v. *Taylor,* 64 N. H. 489, *supra.* See *Luneau* v. *MacDonald,* 103 N. H. 273, 276-277; 3 American Law of Property, *s.* 12.28, *supra,* 252. Hence we hold that the defendant had title to the bed of the river at the site of the excavation, subject of course to the public easement to use the river for navigation, floatage and fishery.

Whatever right the State may have to convey sand and gravel "on the bed of any navigable [tide] water or great pond" pursuant to RSA 4:40-a is not called in question by this case, and what is here said is not intended to define or affect it.

*Remanded.*

All concurred.